Alex B. Kaufman, Esq., AZ Bar No. 035313
Nicholas J. Garcia, Esq., (admitted *pro hac vice*)
**Hall Booth Smith, P.C.**
2710 Old Milton Parkway, Suite 200
Alpharetta, Georgia 30009
Telephone: 404-586-6629
Facsimile: 404-954-5020
Email: akaufman@hallboothsmith.com
       ngarcia@hallboothsmith.com

*Attorneys for DPG Investments, LLC and DPG Golden Eagle, LLC*

# UNITED STATES BANKRUPTCY COURT
## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:<br><br>Westley G. Anderson,<br><br>     Debtor. | Case No.: 2:21-bk-04249-EPB |
| DPG Investments, LLC and DPG Golden Eagle, LLC,<br><br>     Plaintiffs,<br><br>v.<br><br>Westley G. Anderson,<br><br>     Debtor/Defendant. | Adversary No. 2:21-ap-00213-EPB<br><br>MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II OF PLAINTIFFS' COMPLAINT AND FIRST AMENDED COMPLAINT |

## MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II OF THE PLAINTIFFS' COMPLAINT AND FIRST AMENDED COMPLAINT, AND BRIEF IN SUPPORT

COME NOW, **Plaintiffs DPG Investments, LLC** and **DPG Golden Eagle, LLC** (collectively, "Plaintiffs") and file this Motion for Partial Summary Judgment on Counts I and II of the Plaintiffs' Complaint and First Amended Complaint, and Brief in Support of the same ("Motion for Partial Summary Judgment"). The Plaintiffs have filed a separate Statement of Material Facts as to Which There is No Genuine Dispute ("Statement of Material Facts") contemporaneously with this Motion for Partial Summary Judgment. The

Plaintiffs now show this Court more fully as follows:

## I.    STATEMENT OF MATERIAL FACTS

### A.    Procedural History

On August 23, 2021, the Plaintiffs filed a Complaint in the above-captioned Adversary Proceeding, in which the Plaintiff brought the following claims: (1) Counts I: Debt Owed to Plaintiffs is Non-Dischargeable under 11 U.S.C. § 523(a)(4); (2) Count II: Debt Owed to Plaintiffs is Non-Dischargeable under 11 U.S.C. § 523(a)(6); (3) Count III: Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(2); and (4) Count IV: Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(4). (Doc. 1).  On September 21, 2021, Westley Anderson, the Debtor in the above-captioned bankruptcy case and the Defendant in the above-captioned adversary proceeding (the "Debtor"), filed his Answer and Defenses to the Complaint. (Doc. 10).  On October 12, 2021, the Plaintiffs filed their First Amended Complaint, which also includes the same Counts as the original Complaint. (Doc. 14).  On October 26, 2021, the Debtor filed its Answer and Defenses to the Plaintiffs' First Amended Complaint. (Doc. 21).  On June 21, 2022, the Parties filed a Second Amended Rule 7026 Report, in which the Parties agreed to a deadline of December 22, 2022 for motions for summary judgment. (Doc. 54).

### B.    Factual Background

DPG Investments, LLC is a multi-strategy private equity, merchant banking, alternative investment, multi-family office advisory firm that was started by Daniel Galvanoni. (Ex. 1: Aff. D. Galvanoni, Dec. 22, 2022, at ¶3).  DPG Investments, LLC executes its investment strategies through various commonly owned or controlled affiliates

and subsidiaries, including but not limited to DPG Golden Eagle, LLC. (Ex. 1: Aff. D. Galvanoni, Dec. 22, 2022, at ¶4). Spring Tree Holdings, LLC was a wholly owned subsidiary of DPG Golden Eagle, LLC. (Ex. 2: Op. Agreement of Spring Tree Holdings, LLC, at 19). DPG Golden Eagle, LLC provided the management services to Spring Tree Holdings, LLC and other Spring Tree entities, which were the companies that operated in the sub-prime used car auto lending venture in Georgia. (Ex. 1: Aff. D. Galvanoni, Dec. 22, 2022, at ¶¶5-6).

In 2014, Westley G. Anderson (the "Debtor") began working for DPG Investments, LLC and DPG Golden Eagle, LLC. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 18:6-11). The Debtor served as the Chief Operating Officer ("COO") of DPG Golden Eagle, LLC at all times relevant to this Adversary Proceeding. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 19:9-12). The Articles of Organization of DPG Golden Eagle, LLC show that the Debtor was both the Manager and Statutory Agent of that entity. (Ex. 4: Art. of Org. of DPG Golden Eagle, LLC). The Debtor served on the board of directors of Spring Tree Holdings, LLC, which was wholly owned by DPG Golden Eagle, LLC and to which the Debtor owed a fiduciary duty. (Ex. 2: Op. Agreement of Spring Tree Holdings, LLC, at 6, 19; Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 237:16-238:6). The Debtor also served as the president of Spring Tree Holdings, LLC, which was the sole member of Spring Tree Lending, LLC. (Ex. 5: Op. Agreement of Spring Tree Lending, LLC, at 7). Spring Tree Lending, LLC was managed by DPG Golden Eagle, LLC, for which the Debtor was the COO. (*Id.*). The Debtor served as COO until he left DPG in October 2016. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 18:12-13; 170:14-16).

The Debtor was responsible for all technology for the Plaintiffs. (Ex. 6: D. Galvanoni Dep. Tr., Aug. 27, 2019, at 82:7-13). On August 3, 2016, the Debtor sent an email to John Marshall, which included five pictures of Mr. Galvanoni's inbox display on Mr. Galvanoni's computer. (Ex. 7: Email of Pictures, Aug. 3, 2016; Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 204:24-205:2; Ex. 8: J. Marshall Dep. Tr., May 20, 2022, at 130:3-132:22; Ex. 9: J. Marshall Dep. Tr., March 14, 2019, at 145:10-151:19). On or about August 3, 2016, the Debtor accessed Mr. Galvanoni's computer and then the Debtor proceeded to take the pictures attached to the August 3, 2016 email without Mr. Galvanoni's consent, permission, or authority, and while Mr. Galvanoni had left his office during lunch. (Ex. 6: D. Galvanoni Dep. Tr., Aug. 27, 2019, at 120:10-18; Ex. 1: Aff. D. Galvanoni, Dec. 22, 2022, at ¶¶14-17; Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 206:6-207:1, 207:12-15). According to Mr. Marshall, he never asked the Debtor to access Mr. Galvanoni's email, to take pictures of Mr. Galvanoni's emails, or to send pictures of emails to him. (Ex. 8: J. Marshall Dep. Tr., May 20, 2022, at 70:12-16).

Mr. Marshall was an investor with the Plaintiffs in the Georgia sub-prime auto loan venture. (Ex. 8: J. Marshall Dep. Tr., May 20, 2022, at 70:12-16). In August 2016, Mr. Marshall was concerned about his investment with the Plaintiffs and would receive non-public, unauthorized information from the Debtor. (Ex. 8: J. Marshall Dep. Tr., May 20, 2022, at 126:25-127:10; 156:15-16). On or about the same time, the Debtor was also concerned about his investment with the Plaintiffs and was attempting to gather "evidence" against the Plaintiffs. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 216:18-217:4, 221:25-222:2). During this same time, the Plaintiffs were actively negotiating a line of credit with

American Credit Acceptance ("ACA"), which included the exchange of term sheets, drafts of the Credit Agreement, and the ultimate execution of a Credit Agreement with ACA in September 2016 with a commitment amount of $1 million for a 12-month period. (Ex. 10: Emails Between the Plaintiff and ACA, July 8, 2016-August 9, 2016; Ex. 11: Email from ACA to the Plaintiffs re: ACA Credit Agreement, Sept. 8, 2016; Ex. 12: Cover Page for ACA Credit Agreement executed on Sept. 14, 2016).[1]

While COO, the Debtor would routinely record internal telephone conferences between DPG employees for the purpose of forwarding them to Mr. Marshall and for the purposes of gathering "evidence" against the Plaintiffs. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 215:5-217:15; Ex. 8: J. Marshall Dep. Tr., May 20, 2022, at 58-10-59:25). The Debtor would then send the call summaries of the telephone conferences to Mr. Marshall, who was not a party to the subject telephone conferences. (Ex. 8: J. Marshall Dep. Tr., May 20, 2022, at 58-10-59:25, 119:5-121:1; Ex. 13: Call Summaries of Internal DPG Conference Calls, Aug. 1 and 17, 2016). Mr. Galvanoni did not authorize or otherwise consent to the recording of DPG's internal telephone conferences. (Ex. 14: D. Galvanoni Dep. Tr., Aug. 28, 2019, at 416:4-419:21; Ex. 1: Aff. D. Galvanoni, Dec. 22, 2022, at ¶¶18-19).

While still COO, the Debtor spread false information via email to Mr. Marshall to suggest that Mr. Galvanoni was taking funds out of the Plaintiffs. (Ex. 15: Email from the Debtor to Mr. Marshall, dated Aug. 9, 2016). The Debtor also forwarded Mr. Marshall non-

---

[1] The Credit Agreement, dated September 14, 2016, has been marked confidential and its disclosure is subject to protective orders entered in multiple civil actions, which may vary on their terms. Therefore, out of an abundance of caution, the Plaintiffs provide the cover page of the closing document evidencing the transaction on September 14, 2016. Should filing of the Credit Agreement become necessary, the Plaintiffs are willing to provide the Credit Agreement for in camera inspection or some other method so long as the confidentiality of the document of the third-party is maintained.

public and confidential emails involving Mr. Galvanoni regarding company expenses and accounting. (Ex. 16: Email from the Debtor to Mr. Marshall, dated August 11, 2016).  Those same emails contained non-public, confidential financial information regarding payment of consulting fees, which the Debtor immediately forwarded to Mr. Marshall upon receiving the email. (*Id.*) The Debtor would also send Mr. Marshall emails that the Debtor copied and pasted, which contained non-public financial information and strategies (Ex. 17: Email Exchange Between Mr. Galvanoni and Bill Brooksbank, Forwarded to Mr. Marshall by the Debtor, Sept. 14, 2016). The Debtor was not a recipient of the original email chain that he copied and pasted for the purpose of sending to Mr. Marshall on September 14, 2016, but nevertheless, the Debtor accessed and obtained the email for the purpose of sending it to Mr. Marshall. (*Id.*).   The Debtor forwarded Mr. Marshall communications between Mr. Galvanoni and other investors while representing to Mr. Marshall that he was looking for similar communications between Mr. Galvanoni and Mr. Marshall. (Ex. 18: Email from the Debtor to Mr. Marshall, Aug. 2, 2016).

On August 23, 2016, the Debtor, while still COO, filed a UCC lien on behalf of Mr. Marshall against all assets of the Plaintiffs. (Ex. 19: UCC Financing Statement, August 23, 2016; Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 169:22-170:7, 252:13-253:4).  The Debtor drafted the UCC Lien that was ultimately filed, and he was the one that physically filed the UCC Lien. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 169:22-170:7, 252:13-253:4).  The Debtor also emailed Mr. Marshall the form to be used and information as to where to file the UCC Lien in Georgia. (Ex. 20: Email Exchange between the Debtor and Mr. Marshall, Aug. 15, 2016).  The Debtor prepared and filed the UCC lien on Mr.

Marshall's behalf without the knowledge of Mr. Galvanoni and without the approval of Mr. Galvanoni or any other officer of the Plaintiffs. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 253:8-21; Ex. 14: D. Galvanoni Dep. Tr., Aug. 28, 2019, at 410:20-411:1). Mr. Galvanoni only became aware of the preparation and filing of the UCC Lien after the Debtor filed it and after it was recorded on August 23, 2016. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 253:8-21).

On October 7, 2016, the Debtor and the Plaintiffs entered into a Mutual Confidentiality and Non-Circumvention Agreement ("Confidentiality Agreement"). (Ex. 21: Confidentiality Agreement, Oct. 7, 2016). Under the Confidentiality Agreement, "Confidential and Proprietary Information" included

> all information provided by [the Plaintiffs] to [the Debtor] . . . respectively, whether disclosed in writing, via electronic means, or otherwise related to the Opportunity or to the business of [the Plaintiff] that (a) is disclosed by [the Plaintiffs] to [the Debtor] or observed by [the Debtor] on the [Plaintiffs'] premises and (b) is identified as confidential or other similar designation by [the Plaintiffs], **or would otherwise reasonably be understood to be confidential under the circumstances**.

(*Id.* at 1) (emphasis added).

Examples of information falling under the definition of Confidential and Proprietary Information includes but is not limited to all information revealing financing sources, strategic plans, costs, charges, notes, reports, analyses, interpretations, "and other knowledge or information pertinent to [the Plaintiffs' **business, finances, or legal affairs.**" (*Id.*) (emphasis added). Per Section 4(iii) of the Confidentiality Agreement, the Debtor agreed that he would not "directly or indirectly, **contact**, deal with, transact, or otherwise enter into a business arrangement with any . . . contact [of the Plaintiffs] without express written

permission of the [Plaintiffs], which may be withheld in [the Plaintiffs' discretion]." (*Id.* at 3) (emphasis added).

After October 7, 2016, the Debtor continued to contact Mr. Marshall, who was still an investor of the Plaintiffs. (*See generally* Ex.s 22-24: Post Confidentiality Agreement Emails Between the Debtor and Mr. Marshall). On November 10, 2016, the Debtor emailed Mr. Marshall a link for a virtual meeting using the provider Join.Me. (Ex. 22: Email from the Debtor to Mr. Marshall, Nov. 10, 2016). On December 22, 2016, Debtor emailed Mr. Marshall and assisted him with calculations of money allegedly owed to Mr. Marshall by the Plaintiffs. (Ex. 23: Email Between the Debtor and Mr. Marshall, Dec. 22, 2016). Between January 6 and January 16, 2017, the Debtor and Mr. Marshall exchanged emails regarding a potential meeting between the Debtor, Mr. Marshall, and his attorney to assist Mr. Marshall and his attorney with Mr. Marshall's case against the Plaintiffs. (Ex. 24: Emails Exchange Between the Debtor and Mr. Marshall, Jan. 6-16, 2017). On January 12, 2017, Mr. Marshall emailed his attorney, with the Debtor carbon copied, and stated, "I told Wes that you will be recording the call. Wes is glad you will be recording it. Wes wants to get you all the facts and he wants the facts recorded." (*Id.*).

The Debtor's communications with Mr. Marshall after the date of the Confidentiality Agreement continued as the Debtor became the source of the information that Mr. Marshall provided to federal and state authorities regarding the Plaintiffs, which ultimately resulted in their investigation. Mr. Marshall based his opinions on whether or not the Plaintiffs acted "illegally" on information provided to him by the Debtor. (Ex. 8: J. Marshall Dep. Tr., May 20, 2022, at 60:7-15. On February 4, 2017, Mr. Marshall emailed Benjamin Paulin of the

Federal Bureau of Investigation ("FBI"), in which he expressly stated that "they do not know I have information from Wes Anderson of all the corrupt thing they have been doing." (Ex. 25: Email from Mr. Marshall to FBI, February 4, 2017). According to Mr. Marshall, he and the Debtor spoke to each other very often in late 2016 and early 2017, which was after the Debtor's resignation from the Plaintiffs, including after the February 4, 2017 email to the FBI. (Ex. 8: J. Marshall Dep. Tr., May 20, 2022, at 51:8-52:4).

On March 4, 2017, Mr. Marshall emailed Dean Hankenson of the State of California, in which Mr. Marshall made false allegations including but not limited to the Plaintiffs commingling funds, dishonesty on the part of the Plaintiffs, and using the businesses "as basically his own personal piggy bank." (Ex. 26: Email from Mr. Marshall to State of California, March 4, 2017). Throughout the email, Mr. Marshall confirms that the Debtor was the one who told him all the false information described in the email and that the Debtor had provided Mr. Marshall with taped conversations. (*Id.*).

Mr. Galvanoni and the Plaintiffs were ultimately investigated by the Securities Exchange Commission ("SEC"). On March 23, 2020, the SEC's investigation of Mr. Galvanoni and the Plaintiffs concluded in the Plaintiffs favor with a recommendation that no enforcement action be brought against Mr. Galvanoni or the Plaintiffs. (Ex. 27: SEC Letter, March 23, 2020.

As a result of Mr. Marshall's litigation and initiating of state and federal investigations caused by the willful, malicious, and fraudulent conduct of the Debtor, the primary lender of the Georgia Sub-Prime Auto Loan Venture, ACA, terminated the line of credit to the Plaintiffs. (Ex. 14: D. Galvanoni Dep. Tr., Aug. 28, 2019, at 412:16-24, 422:15-18; Ex. 28:

ACA Notice of Default).

The Debtor's actions have caused the Plaintiffs damages in an amount not less than $4,218,000.00 as of December 31, 2017, excluding litigation costs, loss of reputation, and other professional fees incurred by the Plaintiff as a result of the Debtor's willful, malicious, and fraudulent conduct. (Ex. 29: Expert Report of Carrie Zhou). The $4,218,000.00 in damages represents $2,979,000 in loss value of DPG Golden Eagle, LLC's wholly owned subsidiary of Spring Tree Holdings, LLC, and $1,239,000 in lost management fees payable from Spring Tree Lending, LLC to DPG Golden Eagle, LLC. (*Id.*). In addition to the at least $4,218,000.00 described above, the Plaintiffs have incurred additional damages in the form of attorney's fees and costs associated with the litigation and investigations instigated by the Debtor's misconduct in an amount not less than $552,400.00 as of February 17, 2022. (Ex. 30: Aff. of D. Galvanoni, Feb. 17, 2022, attached to the Plaintiffs Proof of Claim).

## II.     LEGAL ARGUMENT AND CITATION OF AUTHORITY

### A.   <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure ("Rule") 56 is applicable in bankruptcy adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056. Summary Judgment pursuant to Rule 56 is appropriate if "there is no genuine issue as to any material fact," and if "the movant is entitled to judgment as a matter of law." *In re Marciano*, 459 B.R. 27, 51–52 (B.A.P. 9th Cir. 2011), aff'd, 708 F.3d 1123 (9th Cir. 2013). "An issue is 'genuine' only if there is an evidentiary basis on which a reasonable fact finder could find in favor of the non-moving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute is 'material' only if it could affect the outcome of the suit under governing law."

*Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter, but determines whether there is a genuine issue for trial." *Id.* at 249 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Id.* at 322–24. Once the movant has met his burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. A judgment is appropriate "as a matter of law" when the nonmoving party has failed to meet its burden of persuading the Court on an essential element of the claim. *See Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 804 (1999). To avoid summary judgment, the nonmoving party must do more than summarily deny the allegations or "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the instant case, the Plaintiffs show that the Debtor has no genuine dispute as to any material fact underlying the Plaintiffs' claims of non-dischargeability pursuant to 11 U.S.C. § 523(a)(4) and 523(a)(6) and the Plaintiffs' claims for damages caused by the Debtor.

**B. The Record Shows that No Genuine Issue of Material Facts Exist as to Count I of the Plaintiff's Complaint and First Amended Complaint for Non-Dischargeability Pursuant to 11 U.S.C. § 523(a)(4).**

Pursuant to 11 U.S.C. § 523(a)(4), a discharge under 11 U.S.C. § 727 does not discharge an individual debtor from any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." For the reasons below, the debt owed to the Plaintiffs is due to be determined non-dischargeable as a matter of law.

**i. The Debtor Owed the Plaintiff a Fiduciary Duty at All Times Relevant to the Plaintiffs' Claims.**

"Whether a relationship is a 'fiduciary' one within the meaning of section 523(a)(4) is a question of federal law." *In re Lewis*, 97 F.3d 1182, 1185 (9th Cir. 1996). Despite "[t]he broad, general definition of 'fiduciary' [being] inapplicable in the dischargeability context," a fiduciary relationship exists for the purposes of section 523(a)(4) if it is one "arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt." *Id.* "Whether a fiduciary is a trustee in that strict and narrow sense, is determined in part by reference to state law." *Id.* (citations omitted) (internal quotations omitted).

In the case of *In re Sky Harbor Hotel Properties, LLC*, this Court certified questions to the Supreme Court of Arizona concerning the existence of common law fiduciary duties owed to an Arizona limited liability company ("LLC"). *In re Sky Harbor Hotel Properties, LLC*, 246 Ariz. 531 (2019). The Supreme Court of Arizona concluded that managers and members serving as agents of an Arizona LLC owe a common law fiduciary duty. *Id.* at 534. In reaching its conclusion, the Supreme Court of Arizona reasoned that "[p]artnerships, joint ventures, and corporations are all owed fiduciary duties by those empowered to act on behalf

of such businesses." *Id.* at 533.

The Supreme Court of Arizona has also determined that board of directors for companies in Arizona also owe a fiduciary duty to the company and its stockholders. *Master Recs., Inc. v. Backman*, 133 Ariz. 494, 497 (1982). As articulated by the supreme court, "[t]his duty is in the nature of a *trust relationship* requiring a high degree of care on the part of the director," and "circumstances which show a course of conduct of causing deliberate injury to the business and reputation of the corporation that supports a finding of bad faith and resulting liability." *Id.* (emphasis added).

There is no genuine issue of any material fact that the Debtor owed the Plaintiffs a fiduciary duty. First, the record shows that the Debtor admits to owing the Plaintiffs a fiduciary duty. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 237:16-238:6). Second, the record shows that the Debtor was the Manager and COO of DPG Golden Eagle, LLC. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 19:9-12; Ex. 4: Art. of Org. of DPG Golden Eagle, LLC). Third, the Debtor served as a Board of Director of the Plaintiff DPG Golden Eagle, LLC's wholly owned entity Spring Tree Holdings, LLC. (Ex. 2: Op. Agreement of Spring Tree Holdings, LLC, at 6, 19; Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 237:16-238:6). The Debtor served in multiple capacities constituting a trust relationship with the Plaintiffs. Therefore, the record shows that there is no genuine issue of material facts that the Debtor owed the Plaintiffs a fiduciary duty.

### ii. The Debtor Violated the Computer Fraud and Abuse Act While Acting in the Capacity of COO.

Under the Computer Fraud and Abuse Act ("CFAA"), individuals violate such act when he or she

(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains--

(A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

(B) information from any department or agency of the United States; or

(C) information from any protected computer;

(4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

(5)(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 U.S.C. § 1030.

"The CFAA defines 'protected computer,' in relevant part, as a computer 'which is used in or affecting interstate or foreign commerce or communication." *United States v. Y%20ucel*, 97 F. Supp. 3d 413, 417 (S.D.N.Y. 2015) (quoting 18 U.S.C. § 1030(e)(2)(B)). Courts have held that this definition include "any computer with an internet connection" *Id.* (citing *Freedom Banc Mortg. Servs., Inc. v. O'Harra*, 2012 WL 3862209, at *6 (S.D.Ohio Sept. 5, 2012); *United States v. Fowler*, 2010 WL 4269618, at *2 (M.D.Fla. Oct. 25, 2010); *Multiven, Inc. v. Cisco Systems, Inc.*, 725 F.Supp.2d 887, 891–92 (N.D.Cal.2010); *Expert Janitorial, LLC v. Williams*, 2010 WL 908740, at *8 (E.D.Tenn. Mar. 12, 2010)).

In the case of *Frisco Medical Center, L.L.P. v. Bledsoe*, the U.S. District Court for the Eastern District of Texas determined that the former COO and former information

systems administrator violated the Computer Fraud and Abuse Act and determined that the underlying debt caused by such actions of the former COO and his wife was non-dischargeable. *Frisco Med. Ctr., L.L.P. v. Bledsoe*, 147 F. Supp. 3d 646, 659 (E.D. Tex. 2015). The district court also concluded that the debtor breached their fiduciary duties to the plaintiff by transmitting and misappropriating highly confidential information, which included, amongst other information, business strategies and proprietary programs developed by the plaintiff and ultimately uploading it their personal desktop computer, "in the final hours of their employment, with the mentality that they knew where 'too many bodies were buried.'" *Frisco Med. Ctr., L.L.P.*, 147 F. Supp. 3d at 662. Accordingly, the district court determined that the debt caused by the debtor-former COO actions were non-dischargeable under 11 U.S.C. § 523(a)(4).

While acting as COO, the Debtor intentionally and knowingly abused and exceeded his access to the technology of the Plaintiffs to fraudulent obtain information from Mr. Galvanoni's computer for the purposes of providing the information to Mr. Marshall to the injury of the Plaintiffs through Mr. Marshall's litigation against the Plaintiffs and initiation of state and federal investigations of the Plaintiffs, premised on information from the Debtor. On August 3, 2016, the Debtor fraudulently accessed Mr. Galvanoni's email account without authorization and took pictures of Mr. Galvanoni's computer screen without Mr. Galvanoni's permission. (Ex. 6: D. Galvanoni Dep. Tr., Aug. 27, 2019, at 120:10-18; Ex. 1: Aff. D. Galvanoni, at ¶¶14-17; Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 206:6-207:1, 207:12-15). Physically accessing Mr. Galvanoni's computer while he was out of the office and physically taking pictures of his computer screen clearly amounts to intentional acts. Mr.

Galvanoni's computer was clearly a protected computer given it had an internet connection, which was evident by the access to email, and its use in and affecting interstate commerce, such as investments from investors from other states.

According to Mr. Marshall, who was the recipient of the fraudulently obtained information, the Debtor wrongfully accessed Mr. Galvanoni's email and wrongfully took pictures of Mr. Galvanoni's computer screen on his own volition. The Debtor intentionally accessed Mr. Galvanoni's because he was disgruntled about his own investment in the Plaintiffs at the time and was attempting to gather evidence against the Plaintiffs for the purposes of injuring the Plaintiffs' business venture. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 216:18-217:4, 221:25-222:2). The record shows that there are no genuine issues of material facts that the Debtor intentionally and knowingly accessed Mr. Galvanoni's computer without authorization for the purposes of defrauding and causing damages to the Plaintiffs. The record shows that the Debtor transmitting the information on August 3, 2016 for the purpose of intentionally causing damage to the Plaintiffs. As shown in Section II(B)(iv) of this Brief, the Debtor in fact caused the Plaintiffs damages. Accordingly, the Plaintiffs are entitled to summary judgment on their claim of violations of the Computer Fraud and Abuse Act and their claim of non-dischargeability based on the same.

### iii. The Debtor Filed a UCC Lien on Behalf of Investor John Marshall Against Assets of the Plaintiffs while Acting as COO.

"Defalcation" under 11 U.S.C. § 523(a)(4) involves either bad faith, moral turpitude, or other immoral conduct or it requires an intentional wrong." *In re Licursi*, 573 B.R. 786, 807 (Bankr. C.D. Cal. 2017). "The fiduciary must know that it is improper or it can be so reckless that it is due to a conscious disregard or willful blindness to a substantial and

unjustifiable risk that the conduct will turn out to violate a fiduciary duty." *Id.*

In the case of *In re Licursi*, the U.S. Bankruptcy Court for the Central District of California determined that the creditor was entitled to summary judgment on its claim under 11 U.S.C. § 523(a)(4) and that the debt owed by the debtor was non-dischargeable because the debtor sold assets of the creditor in bad faith without paying the creditor and without the creditor's knowledge. *In re Licursi*, 573 B.R. 786, 807 (Bankr. C.D. Cal. 2017).

Here, there are no genuine issues of material facts that the Debtor encumbered the assets of the Plaintiffs intentionally and in bad faith when he filed a UCC lien on behalf of Mr. Marshall while acting as COO. (Ex. 19: UCC Financing Statement, August 23, 2016; Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 169:22-170:7, 252:13-253:4, 253:8-21; Ex. 14: D. Galvanoni, Aug. 28, 2019, at 410:20-441:1).   Such misconduct of the Debtor constitutes defalcation of the Plaintiffs while acting as a COO.   Therefore, summary judgment on the Plaintiffs' claim of 11 U.S.C. § 523(a)(4) is warranted.

### iv.    The Debtor Caused Damages to the Plaintiffs.

As a result of the Debtor's violations of the Computer Fraud and Abuse Act, the dissemination of Unauthorized and False Information regarding the Plaintiff, and the Debtor's filing of the Marshall Lien, the Plaintiffs suffered damages in the form of loss value and lost management fees.  ACA termianted their line of credit for the Spring Tree entities based on the UCC lien filed by the Debtor while serving as COO and the SEC investigation premised on information provided to Mr. Marshall by the Debtor while serving as COO, including but not limited to information obtained in violation of the Computer Fraud and Abuse Act.

As articulate by Expert Witness Carrie Zhou in her Expert Report, a copy of which is attached hereto as Exhibit 29, the Plaintiffs suffered damages in an amount not less than $4,218,000.00 as of December 31, 2017, excluding litigation costs, loss of reputation, and other professional fees incurred by the Plaintiff as a result of the Debtor's willful, malicious, and fraudulent conduct. The $4,218,000.00 in damages represents $2,979,000 in loss value of DPG Golden Eagle, LLC's wholly owned subsidiary of Spring Tree Holdings, LLC, and $1,239,000 in lost management fees payable from Spring Tree Lending, LLC to DPG Golden Eagle, LLC. In addition to the at least $4,218,000.00 described above, the Plaintiffs have incurred additional damages in the form of attorney's fees and costs associated with the litigation and investigations instigated by the Debtor's misconduct in an amount not less than $552,400.00 as of February 17, 2022. Accordingly, the Plaintiffs are entitled to summary judgment in the amount not less than $4,770,000.00.[2]

There is no genuine issue of material fact that the Debtor committed fraud under the Computer Fraud and Abuse Act and defalcation in the form of disseminating false information and unauthorized information to investor John Marshall, all while acting in a fiduciary capacity of COO and Manager of DPG Golden Eagle, LLC, and President and Board of Director Spring Tree Holdings, LLC (which was the Sole Member of Spring Tree Lending). As a result of the Debtor's misconduct in providing Mr. Marshall with false information and unauthorized information, the Plaintiffs were investigated by the State of California, the State of Arizona, and the SEC. Such misconduct and the Debtor's misconduct in filing a UCC lien on all assets of the Plaintiff also caused ACA to pull all funding of the

---

[2] Plaintiffs reserve the right to supplement this figure to include an updated amount for attorney's fees and costs.

Plaintiffs' Georgia Subprime Auto Loan Venture, resulting in millions of dollars loss value and lost management fees. The record shows that no genuine issue of material facts exist as to the Plaintiffs' claim of non-dischargeability under 11 U.S.C. § 523(a)(4) and the underlying materials facts. Therefore, the Plaintiffs are entitled to summary judgment on Count I of its Complaint and First Amended Complaint.

C. **The Record Shows that No Genuine Issue of Material Facts Exist as to Count II of the Plaintiff's Complaint and First Amended Complaint for Non-Dischargeability Pursuant to 11 U.S.C. § 523(a)(6).**

Pursuant to 11 U.S.C. § 523(a)(6), a discharge under 11 U.S.C. § 727 does not discharge an individual debtor from any debt for "for willful and malicious injury by the debtor to another entity or to the property of another entity." A "willful" injury is when "either the debtor had a subjective motive to inflict injury or that the debtor believed that injury was substantially certain to occur as a result of his conduct." *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001). "'Willful' intent does not require that the debtor have had the specific intent to injure the creditor, if the act was intentional and the debtor knew that it would necessarily cause injury." *In re Kaplan*, 2016 WL 1321138 (Bankr. C.D. Cal. Apr. 1, 2016) (citing *In re Jercich*, 238 F.3d at 1207). A "malicious" injury is "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *In re Jercich*, 238 F.3d at 1209. To prove a malicious injury "requires only an intentional act which causes injury." *In re Bammer*, 131 F.3d 788, 791 (9th Cir. 1997).

The Debtor willfully and maliciously injured the Plaintiff by (1) drafting and then filing a lien against the Plaintiffs' assets on behalf of John Marshall, (2) disseminating false

information and unauthorized information to investor John Marshall while acting in a fiduciary capacity, and (3) breaching the Confidentiality Agreement by providing John Marshall false information and unauthorized information regarding the Plaintiffs in Breach of the Confidentiality Agreement.

> **i.** **The Debtor Willfully and Maliciously Injured the Plaintiffs by Filing a UCC Lien on Behalf of Former Investor John Marshall.**

There is no genuine issue of material fact that the Debtor willfully filed the UCC lien on behalf of Mr. Marshall against all of the Plaintiffs' assets. Around the time the Debtor filed the UCC lien, the Debtor was trying to gather evidence against the Plaintiffs in an effort to recover from the Plaintiffs. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 216:18-217:4, 221:25-222:2). Furthermore, logic demands that the Debtor knew that his intentional act of physically preparing and physically filing of UCC Lien against all of the Plaintiffs' assets during the Plaintiffs' offering its assets as collateral under the ACA Credit Agreement would cause ACA to terminate the line of credit and thus cause damages to the Plaintiff. Therefore, no genuine issue of material facts exists as to the "willful" prong of the Plaintiffs' claims under 11 U.S.C. § 523(a)(6).

Additionally, there is no genuine issue of material fact as to the "malicious" prong of the Plaintiffs' claims under 11 U.S.C. § 523(a)(6). The Debtor's intentional act of physically preparing and filing the UCC lien against all the assets of the Plaintiffs was wrongful because the Debtor did so as the COO, without any authorization from the Plaintiffs, and without the Plaintiffs knowledge. The Debtor's act of preparing and filing the UCC lien was clearly intentional, especially in light of the fact that he physically went to the clerk of the respective Arizona state court to physically file the UCC lien. The filing of the UCC lien caused

damages to the Plaintiff in that it encumbered all of the Plaintiffs' assets, which resulted in the default and ultimate termination of the Plaintiffs' line of credit from ACA. Furthermore, the Debtor had no excuse or justification for filing a UCC lien on behalf of an investor of the Plaintiffs against the very company for which he served as COO and in a fiduciary capacity. Therefore, no genuine issue of material facts exist as to the Debtor willfully and maliciously injuring the Plaintiffs and their property. Thus, the Plaintiffs are entitled to summary judgment on its claims under 11 U.S.C. § 523(a)(6) and the underlying issues.

> ### ii. The Debtor Willfully and Maliciously Disseminated Unauthorized and False Information to Investor John Marshall while Acting as COO.

The record shows that the Debtor provided investor John Marshall with false information and unauthorized, confidential information of the Plaintiffs while acting as COO of DPG Golden Eagle, LLC for the purposes of causing willful and malicious injury to the Plaintiffs. While acting as COO, the Debtor secretly recorded internal telephone conferences of the Plaintiff, forwarded Mr. Marshall emails with non-public financial information of the Plaintiffs while accusing the Plaintiffs of improperly using funds, and actively searched for emails regarding representations made by Mr. Galvanoni to Mr. Marshall for the purposes of sending such information to Mr. Marshall. (Ex. 3: W. Anderson Dep. Tr., Dec. 12, 2018, at 215:5-217:15; Ex. 8: J. Marshall Dep. Tr., May 20, 2022, at 58-10-59:25; (Ex. 15: Email from the Debtor to Mr. Marshall, dated Aug. 9, 2016; Ex. 17: Email Exchange Between Mr. Galvanoni and Bill Brooksbank, Forwarded to Mr. Marshall by the Debtor, Sept. 14, 2016; Ex. 13: Call Summaries of Internal DPG Conference Calls, Aug. 1 and 17, 2016; Ex. 14: D. Galvanoni Dep. Tr., Aug. 28, 2019, at 416:4-419:21; Ex. 1: Aff. D. Galvanoni, at ¶¶18-19).

The Debtor acted in such a manner because he was gathering evidence against the Plaintiffs while still working for the Plaintiffs and acting as COO. Such intentional and wrongful conduct satisfies the willful and malicious prongs of 11 U.S.C. § 523(a)(6). Accordingly, summary judgment as to the Plaintiffs' claims of non-dischargeability under 11 U.S.C. § 523(a)(6) is warranted.

### iii. The Debtor Willfully and Maliciously Injured the Plaintiffs by Providing Investor John Marshall False Information in Breach of the Confidentiality Agreement.

The record shows that the Debtor provided investor John Marshall with false information and unauthorized, confidential information of the Plaintiffs in breach of the Confidentiality Agreement. The Debtor directly contacting and communicating with Mr. Marshall was in itself a violation of the Confidentiality Agreement. (*See generally* Ex. 21: Confidentiality Agreement, Oct. 7, 2016, at 3; Ex.s 21-24: Post Confidentiality Agreement Emails Between the Debtor and Mr. Marshall). Furthermore, the Debtor provided Mr. Marshall with information to assist Mr. Marshall in bringing claims against the Plaintiffs and initiating state and federal investigations against the Plaintiffs. (*See generally* Ex.s 21-24: Post Confidentiality Agreement Emails Between the Debtor and Mr. Marshall; Ex. 25: Email from Mr. Marshall to FBI, February 4, 2017; Ex. 26: Email from Mr. Marshall to State of California, March 4, 2017). The Debtor provided information pertinent to the Plaintiffs business, finances, and legal affairs, in violation of the Confidentiality Agreement. The Debtor knew that Mr. Marshall was consulting an attorney regarding claims against the Plaintiff. (Ex. 24: Emails Exchange Between the Debtor and Mr. Marshall, Jan.6-16, 2017). The Debtor knew that providing such information would cause injury to the Plaintiffs, and

therefore, the Debtor's misconduct was willful. Furthermore, the Debtors misconduct was malicious for the following reasons: (1) it was wrongful in that it was in breach of the Confidentiality Agreement; (2) he intentionally provided Mr. Marshall with information to assist Mr. Marshall with his claims against the Plaintiffs and to initiate state and federal investigations of the Plaintiffs; (3) the Plaintiffs were damaged in the form of loss value, lost management fees, and incurring unnecessary litigation costs; and (4) the Debtor had no justification or excuse in breaching the Confidentiality Agreement to the damage of the Plaintiffs. Accordingly, the Plaintiffs are entitled to summary judgment on its claims of non-dischargeability under 11 U.S.C. § 523(a)(6).

### iv. The Debtor Caused Injury to the Plaintiffs.

As discussed in Section II (B)(vi) above, the Debtor's action has caused the Plaintiffs significant damages in an amount not less than $4,218,000.00 in damages, including loss value and lost management fees, in addition to an amount not less than $552,400 for attorney's fees and costs through February 17, 2022, which the Plaintiffs continue to incur. Accordingly, the Plaintiffs are entitled to summary judgment in the amount not less than $4,770,400.00.[3]

### III. CONCLUSION

For the reasons stated herein, the Plaintiffs are entitled to summary judgment on Counts I and II of their Complaint and First Amended Complaint.

**WHEREFORE**, Plaintiffs respectfully request that the Court grant the following relief:

---

[3] Plaintiffs reserve the right to supplement this figure to include an updated amount for attorney's fees and costs.

(1) Enter an order granting its Motion for Partial Summary Judgment on Count I of the Plaintiffs' Complaint and First Amended Complaint;

(2) Enter an order granting its Motion for Partial Summary Judgment on Count II of the Plaintiffs' Complaint and First Amended Complaint;

(3) Enter an order and judgment declaring the debt owed by the Debtor to the Plaintiffs non-dischargeable;

(4) Enter and order and judgment in favor of the Plaintiffs against the Debtor for damages in an amount not less than $4,770,400.00, plus additional attorney's fees and costs incurred by the Plaintiffs and post-judgment interest;

(5) and further relief as this Court deems just and proper.

Respectfully submitted this 22nd day of December, 2022.

By: */s/ Alex B. Kaufman*
ALEX B. KAUFMAN
NICHOLAS J. GARCIA
Hall Booth Smith, P.C.
2710 Old Milton Parkway, Suite 200
Alpharetta, Georgia 30009
Telephone: 404-586-6629
Facsimile: 404-954-5020
Email: akaufman@hallboothsmith.com
ngarcia@hallboothsmith.com

# UNITED STATES BANKRUPTCY COURT
## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: | Case No.: 2:21-bk-04249-EPB |
| Westley G. Anderson, | |
|       Debtor. | |
| DPG Investments, LLC and DPG Golden Eagle, LLC, | |
|       Plaintiffs, | Adversary No.  2:21-ap-00213-EPB |
| v. | |
| Westley G. Anderson, | MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II OF PLAINTIFFS' COMPLAINT AND FIRST AMENDED COMPLAINT |
|       Debtor/Defendant. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 22, 2022, I electronically transmitted the attached document and caused the same to be served by the Court's electronic delivery/service system and U.S. Mail at the addresses below:

Warren J. Stapleton
Osborn Maledon
2929 N. Central Avenue, Suite 2100
Phoenix, AZ 85012

By:  <u>*s/ Alex B. Kaufman*</u>