

Warren J. Stapleton, 018646
**OSBORN MALEDON, P.A.**
2929 North Central Avenue
21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
E-mail: wstapleton@omlaw.com

Attorneys for Westley G. Anderson

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| In re:<br><br>Westley G. Anderson,<br><br>Debtor. | Chapter 7<br><br>Case No. 2:21-bk-04249-EPB |
|---|---|
| DPG Investments, LLC and DPG Golden Eagle, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>Westley G. Anderson, an Individual,<br><br>Debtor/Defendant. | Adversary No. 2:21-ap-00213-EPB<br><br>**ANDERSON'S CONTROVERTING STATEMENT OF FACTS IN SUPPORT OF HIS RESPONSE TO DPG'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I and II OF DPG'S ADVERSARY COMPLAINT** |

Westley G. Anderson ("Anderson"), by and through undersigned counsel, files this Controverting Statement of Facts ("CSOF") in response to DPG Investments, LLC and DPG Golden Eagle, LLC's ("DPG" or "Plaintiff") motion for partial summary judgment on counts I (Section 523(a)(4)) and II (Section 523(a)(6)) of DPG's adversary complaint. Anderson's response is supported by the attached memorandum and its separately filed statement of controverting facts.

1. DPG's adversary proceeding arises from the 2015 and 2016 time period when Anderson was the chief operating officer of DPG Investments, LLC ("DPG Investments") and manager for DPG Golden Eagle, LLC ("DPG Golden Eagle"). Exhibit A, Anderson Affidavit, ¶ 3.

2. At that time, Dan Galvanoni – the "Chairman" of DPG Investments and DPG-Golden Eagle, also owned several other entities including Spring Tree Lending, LLC, Spring Tree Financial, LLC, Spring Tree Holdings, LLC, and Skipbo Holdings, LLC (the "DPG Affiliates"). Exh. A, Anderson Affidavit, ¶ 4. In this CSOF, DPG Investments, DPG Golden Eagle, and the DPG Affiliates are frequently collectively referred to as "DPG" to denote their common enterprise. The alleged business of DPG was subprime auto lending.

3. DPG Investments and DPG Golden Eagle were the investment arm of DPG's business and the DPG Affiliates were the lending arm. Exh. A, Anderson Affidavit, ¶ 5.

4. Between June 2015 and March 2016, Galvanoni induced a man named John Marshall to invest $300,000 into DPG's business. These purported loans were not well documented – although it appears DPG attempted to prepare a set of documents reflecting the loans that Mr. Marshall never signed. Exh. A, Anderson Affidavit, ¶ 6 and Exh. B.

5. Galvanoni assured Marshall, among other things, that his investment was secured and personally guaranteed. These representations were inaccurate. Exh. A, Anderson Affidavit, ¶ 7; Dkt #85-7, pp. 2-3.

6. In approximately July 2016, Anderson grew uncomfortable with the representations that Galvanoni/DPG were making to Marshall and advised Marshall that he did not believe that Galvanoni was being truthful about many of the representations. Exh. A, Anderson Affidavit, ¶ 8.

7. To this end, on or about August 3, 2016, Anderson provided Marshall with five emails that Galvanoni had sent to Marshall about these investments between June 25, 20915 and August 11, 2015. Exh. A, Anderson Affidavit, ¶ 9, and Dkt #85-7, pp. 2-3.

8. DPG knows that Galvanoni authorized Anderson to access Galvanoni's email. In December 2018, in litigation between Mr. Marshall and DPG, counsel for DPG asked Anderson the following questions and received the following answers:

Q: Why did you take a picture and send it to John Marshall?

> A: It appears it is relevant to his investment.
>
> Q: Did Dan [Galvanoni] give you permission to access hi email and take pictures of it?
>
> A: Dan authorized me to deal in all matters with John Marshall.
>
> Q: Including accessing his email?
>
> A: I don't specifically recall. He did, yes, he did give me direct access to his email.

Exh. A, Anderson Affidavit, ¶ 10, and Dkt 85-3, p. 12 of 18 (p. 207, ll. 2-11).

9. Most of the information that DPG claims Anderson shared related to Mr. Marshall's investments with DPG. As such, Anderson was acting in furtherance of DPG's obligations to its investor. This was the case with the DPG "group" calls recorded by Anderson and shared with Marshall. These calls were mainly about how to handle DPG's and DPG's Affiliates' finances (including Mr. Marshall) while these companies were struggling.[1] It was my understanding that was lawful for me to record these calls and others on the call, like Bill Brooksbank, also recorded these calls. Exh. A, Anderson Affidavit, ¶ 11 and Dkt 85-13; Dkt #85-17, p. 3 ("The company can't pay anything besides Jerry[2] but this is in place as we move forward . . ." from Galvanoni's July 28, 2016, email to Bill Brooksbank).

10. Anderson believes that the real reason that DPG and Galvanoni remain angry – and are still pursuing this case over three separate proceedings – is because the information that Anderson provided was not flattering to Galvanoni. Exh. A, Anderson Affidavit, ¶ 12.

11. For example, Anderson provided Marshall with a November 4, 2015, email from Galvanoni to Jim Duryea, the former 100% owner of TSA Financial Group, LLC (an entity acquired by DPG Golden Eagle). TSA's $4.5 million in subprime auto receivables constituted the primary asset of the DPG enterprise. Exh. A, Anderson

---

[1] It is well known that Arizona does not prohibit one party to a call from recording that conversation. *See* A.R.S. §§ 13-3005(2), 13-3012(9).
[2] Jerry Hudspeth was the chairman of Spring Tree Lending. Dkt #85-17, p. 4.

1 Affidavit, ¶ 13, Exh. B, p. 2 (Marshall Loan Agreement); Exh. C, p. 2 (November 4, 2015, email from Galvanoni to Jim Duryea).

12. In Galvanoni's November 4, 2015, email, and well before Marshall had loaned most of his $300,000 investment into DPG's auto subprime business, Galvanoni called TSA a "Ponzi Scheme and Fraud." Exh. C, p. 2. Further, as DPG's financial woes deepened in the summer of 2016, Galvanoni – in contravention of his fiduciary responsibilities to DPG's creditors – preferred payments to insiders and family members. *See* Dkt #85-15, p. 3. When Anderson queried Galvanoni about the payment of Marshall's interest, Galvanoni replied, "He can f*ck himself." Exh. A, Anderson Affidavit, ¶ 14 and Exh. D.

13. All this information was disclosed prior to October 7, 2016 – when Anderson purportedly signed the Confidentiality Agreement. Exh. A, Anderson Affidavit, ¶ 15, Dkt #85-8, #85-13, #85-15, #85-16, #85-17, #85-18, #85-19, #85-20, #85-21 (DPG Exhs. 8, 13, 15-20) (showing this information was transmitted in August 2016); Exh. E, pp. 100, ll. 18-25; 101, ll. 1-6.

14. At this point, Anderson was no longer even working for DPG. When asked about this in his deposition in this adversary, Anderson noted that he only signed the agreement under duress:

Q: [Had Anderson stopped working in] July of 2016?

A: Yeah. And then – and then I came back. I was forced to come back in October. They were holding funds I lent them, and they couldn't pay back unless I agreed to come back into the office, migrate their emails, waive all my options and rights to any position at Spring Tree or else they were gonna sue me and not release the money loaned them, so. Oh yeah, and forced that I had to sign this NDA.

Q: Had to? There was a gun to your head? What do you mean you had to?

A: It was in the list of demands to get my money.

Q: Okay. And you accepted that agreement, correct?

A: I mean under duress at that time. I really needed the money, so year. It was – it was very stressful, and I was under significant duress.

Exh. E, Anderson Deposition, 4/28/2022, p. 84. Anderson only signed the Confidentiality Agreement because he was threatened with being sued and because DPG threatened to withhold the funds Anderson had loaned DPG if Anderson refused to sign the Confidentiality Agreement. Exh. A, Anderson Affidavit, ¶ 16.

15. Anderson did not inappropriately record a lien on Marshall's behalf. The August 10, 2015, email from Galvanoni to Marshall states, "50,000 loan, *senior secured against all assets*, 57,500 face, fund 45,000k [sic], 12,500 profit in 30-60 days extensions clauses will be hefty warrants and cash." Galvanoni himself promised Marshall a "senior secured" lien on all DPG's assets. Exh. A, Anderson Affidavit, ¶ 17, Dkt #85-7, p. 3.

16. Marshall remembered this promise. On July 30, 2016, he wrote to Galvanoni, Anderson, and others at DPG: "Again, please make sure I am in first position on the existing portfolio of 78 loans currently. I need to have my money secured in the first position. I need you or Joe to write back to me and confirm my money is in the first position on the existing loans/portfolio."[3] Anderson actions were consistent with any fiduciary duty that he had and with the promises DPG made to Marshall. Exh. A, Anderson Affidavit, ¶ 18, Dkt #85-26, p. 3.

17. Anderson signed the Confidentiality Agreement under duress and did not share DPG documents after signing it. Exh. A, Anderson Affidavit, ¶ 19, Exh. E, p. 82, ll. 18-24.

18. DPG's proof is woefully short of violating the Confidentiality Agreement. The few emails that DPG cobbles together cover basically two issues: (1) Anderson assisting Marshall with the calculation of his claim based upon information he had already supplied to Marshall; and (2) communications with Marshall's counsel in advance of Marshall's California lawsuit. Notably this latter category does not actually involve the communication of any facts about DPG – just communications indicating that Anderson

---

[3] In January 2017, Marshall also wrote, "Jerry Hudspeth, Dan Galvanoni, Wes Anderson, DPG assured me my money is secured on loans, and is not any problem to go out and sell the loans to get my money back plus other interest and money owed to me." Dkt 85-25, p. 2 of 8 (January 20, 2017, email from Marshall to Joe Joseph).

would be willing to meet with and discuss Marshall's claims with Marshall's counsel. Exh. A, Anderson Affidavit, ¶ 20, Dkt #85, p. 8 and #85-22 through 85-24.

19. Regarding the calculations Anderson testified as follows:

Q: And you also updated macro formulas in an Excel spreadsheet in October, correct?

A: I did. John [Marshall] emailed me a spreadsheet, and I helped him change the formulas, but again, I didn't receive that from DPG after signing the document.

Q: Right. That was – so you changed the formulas based upon – of the internal DPG and affiliated entities to represent ownership that John Marshall claimed he had; isn't that correct? In October?

A: John Marshall had notes or interest, and he wanted to know how the formulas worked, so he emailed me the document, and I did assist him in showing him how to change the formulas. Correct.

Q: Well, you didn't just show John Marshall how to do it, you actually went in and changed the cap tables and formulas that belonged to DPG.

A: ***No. I think I just updated the dates and the records so it would reflect what the loans were.***

Exh. E, p. 84, ll. 23-25; p. 85, ll. 1-16 (emphasis added). Anderson did not provide Marshall with confidential information; he simply provided him with the know-how to work an Excel spreadsheet. Exh. A, Anderson Affidavit, ¶ 21.

20. DPG preposterously asserts that due to Anderson's alleged fraud, DPG's business failed. This is false. DPG's own motion is supported with many exhibits evidencing the financial problems afflicting company before Marshall sued or the SEC began its investigation. For example, in response to a request for payment from one of Spring Tree Lending's investor-solicitors in July 2016, Galvanoni wrote: "All I know is this. You have raised no money, and I got ripped off than I took over and am taking all the risk. I will take everything into consideration and am open and fair. The company can't pay anything besides Jerry but this is in place as we move forward...." Exh. A, Anderson Affidavit, ¶ 22. Dkt #85-17, p. 3 (July 28, 2-16).

21. Ironically, Galvanoni made no mention of DPG's financial distress when communicating the company's financial strength to Marshall. On July 26, 2016, two days

prior to Galvanoni's admission that the "company can't pay anything besides Jerry" Galvanoni continued to assure Marshall regarding the strength of DPG's financial position: two days earlier (July 26, 2016) Galvanoni had told Marshall:

> John,
> We executed the term sheet and wired the 10k in for legal... 4mm 8OLTC first draw up to 10mm revolving AR line...
> They gave us flexibility and I know the owners which was key.
> Is a family with 20mm in cash and 150mm in bank lines...
> We are due to close in 20-30 business days....
> We are sizing up the pay plan and waiting on Joe for all the info...
> We can get to 12mm with this line,
> Am in plane heading to investor estate for night, the gentlemen I referenced yesterday.
> Jerry and him spoke for 3 hours yesterday,
> Is so nice as we don't need him is just a bonus....if structure is right...

Exh. A, Anderson Affidavit, ¶ 23, Dkt #85-26, p. 3.

22. Internally, DPG could not afford to pay its employees. Externally, DPG was desperately trying to raise capital and quiet investor concern with misleading assurances of solvency. Exh. A, Anderson Affidavit, ¶ 24.

23. Anderson's expert, Lynton Kotzin performed an analysis of DPG's financials.[4] See Exhibit F. At that point, DPG had provided only one full year of financial information of Spring Tree Lending (the primary holder of DPG's "new," i.e., non-TSA subprime auto loans). Spring Tree had total revenue of $466,228. Exh. F, p. 31.[5] (DPG's net income was negative $547,628.) Id.

24. Nevertheless, according to DPG's expert, DPG would have gross revenues of $2.7 million in 2018, $5.6 million in 2019, $8.9 million in 2020, $13.8 million in 2021,

---

[4] While it is true that Kotzin analyzed an earlier damages report, the numbers used by DPG's experts have not appreciably changed (in part because they still use the same Aprio-based information). Kotzin's report still effectively rebuts DPG's "new" expert report. By way of example, in the report analyzed by Kotzin the revenue growth was estimated by DPG's experts to increase 121%, 65%, 63%, and 63% in years 1-4, respectively, of DPG's projection. Exh. F, p. 5 of 40. DPG's new expert report has revenue growth of 106.8%, 60.3%, 53.8%, and 42.4% in years 1-4, respectively. Dkt #85-29, p. 57.

[5] Exhibit F's page numbers refer to the large 14-point number in the bottom center of the page.

and $19.6 million in 2022. Dkt #85-29, p. 27. These numbers correspond to revenue growth of 106.8%, 60.3%, 53.8%, and 42.4% in years 1-4, respectively. Dkt #85-29, p. 57.

25. Yet, as Mr. Kotzin pointed out:

> Review of the IBISWorld Subprime Auto Loans in the US industry report indicates that the companies in the industry are projected to grow 3.8 percent annually, excluding inflation. Even assuming that year's 1 through 4 could achieve double industry growth due to its status as a startup company, the projections utilized by the Aprio Report are clearly unreasonable. To grow faster than the industry is to assume that Company would take market share from competitors, and no information has been provided as to why SpringTree, as a small start-up, would have this ability. As noted in the IBISWorld Subprime Auto Loans industry report, "the subprime auto loans industry exhibits a significant degree of fragmentation, and therefore, is highly competitive.

Exh. F, p. 6. DPG's revenue figures are wholly unsupported by any realistic assumptions.

26. As Kotzin noted, "SpringTree is an unestablished business with limited operating history, no established track record, and no historical positive net income of cashflow." Exh. F, p. 5. Further, DPG's expert does not appear to have familiarity with the relevant industry-specific facts relevant to DPG's proposed subprime loan portfolio. As stated in Kotzin's rebuttal report, "the IBISWorld Subprime Auto Loans industry report, subprime loans for used cars average a 13.1 percent interest rate. . . [d]eep subprime loans averaged an interest rate of approximately 19.9 percent per Experian for used vehicles." Exh. F, p. 6. Here, DPG's expert, without explanation, uses a 25% rate for all of DPG's loans. Dkt #85-29, p. 63.

27. Kotzin concluded, "[o]utside of projecting the actual level of borrowings or a third-party cash infusion required to increase the size of SpringTree's loan portfolio, the Company does not generate enough cash flow to fund the growth of its loan portfolio to a size that would be able to support the revenue growth at the rate the Aprio Report projects." Exh. F, p. 6. In short, DPG's expert report is hotly contested and certainly not amenable to being treated by the Court as an undisputed fact.

28. Ultimately, because DPG failed to repay Marshall's $300,000 loan, or satisfactorily answer Marshall's questions, Marshall sued DPG Investments, DGP Golden Eagle, the DPG Affiliates, and Galvanoni in March 2017. (Copy of Marshall's California Complaint against DPG is attached hereto as Exhibit G.) That matter settled on undisclosed terms. Exh. A, Anderson Affidavit, ¶ 25.

29. In the meantime, the Securities and Exchange Commission also began an investigation into the conduct of DPG. As Anderson was part of the management of DPG, he was targeted along with Galvanoni and the other managers of the entities. Exh. A, Anderson Affidavit, ¶ 26.

30. The SEC determined not to pursue an enforcement action against Mr. Galvanoni, writing:

> we do not intend to recommend an enforcement action by the Commission against Mr. Galvanoni. We are providing this notice under the guidelines set out in the final paragraph of Securities Act Release No. 5310, which states in part that the notice **"must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation**."

Exh. A, Anderson Affidavit, ¶ 27, Dkt #85-27. The SEC's explicit statement that Galvanoni has not been exonerated hardly supports DPG's argument that Anderson "defrauded" DPG and Galvanoni by spreading lies.

31. Shortly after Marshall filed his lawsuit against DPG and the DPG Affiliates, DPG and the DPG Affiliates (except Skipbo Holdings) sued Anderson in Georgia. The thrust of that complaint – like this adversary proceeding, and like a subsequent 2020 civil lawsuit brought in Arizona – was that Anderson: (a) breached his fiduciary duty to DPG and the DPG Affiliates by sharing information with Marshall; and (b) improperly shared confidential business information in violation of a non-disclosure agreement. (A copy of DPG's Georgia state court complaint is attached hereto as Exhibit H.) It is not clear what happened to the Georgia action – it appears to have simply languished in Georgia state court. Exh. A, Anderson Affidavit, ¶ 28.

32. Following the settlement with Marshall and the SEC's decision not to prosecute, however, DPG again sued Anderson – this time in Arizona. (A copy of DPG's Arizona complaint is attached hereto as Exhibit I.) Like the aforementioned Georgia action, this case also alleged that Anderson breached his fiduciary duty to DPG. It also alleges that Anderson improperly shared confidential information but shifts its theory to violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030). Exh. A, Anderson Affidavit, ¶ 29.

33. Anderson, who had suffered the expenses of the Georgia litigation, an SEC Investigation, and now the Arizona litigation decided that he could no longer afford to fight with Galvanoni. Exh. A, Anderson Affidavit, ¶ 30.

34. Accordingly, he filed Chapter 7 on June 1, 2021. Dkt #1, Case No. 2-21-bk-4249-EPB. Maureen Gaughan is the Chapter 7 Trustee. DPG's adversary complaint was filed on August 23, 2021 and its First Amended Complaint was filed on October 12, 2021. Dkt # 1 and 14, Adv. No. 2-21-ap-213-EPB. Exh. A, Anderson Affidavit, ¶ 31.

35. Anderson did not cause and never intended to harm DPG's business. Exh. A, Anderson Affidavit, ¶ 32.

36. Anderson did not cause and never intended Marshall to initiate a lawsuit against DPG. Exh. A, Anderson Affidavit, ¶ 33.

37. Anderson did not cause and never intended to cause the SEC or any state regulatory agency to investigate DPG. Exh. A, Anderson Affidavit, ¶ 34.

38. Anderson did not cause, nor ever intended to cause DPG to lose its ability to obtain financing. Exh. A, Anderson Affidavit, ¶ 35.

39. Anderson assisted Marshall in the 2016 because he felt obliged to assist a person that had invested in DPG. Anderson believes that all of his actions were consistent with his fiduciary responsibilities to DPG and to Marshall. Exh. A, Anderson Affidavit, ¶ 36.

40. Anderson had authority to access all of DPG's computers including Dan Galvanoni's computer. Exh. A, Anderson Affidavit, ¶ 37.

10

Case 2:21-ap-00213-EPB   Doc 93   Filed 02/03/23   Entered 02/03/23 16:10:11   Desc
9790090                     Main Document    Page 10 of 11

41.     Anderson tried to part amicably with DPG and authored the emails sent by me attached hereto as Exhibit J.

DATED this 3rd day of February, 2023.

OSBORN MALEDON, P.A.

By     /s/ Warren J. Stapleton
Warren J. Stapleton
2929 North Central Avenue
21st Floor
Phoenix, Arizona  85012-2793
*Attorneys for Westley G. Anderson*

COPY of the foregoing sent via email
this 3rd day of January, 2023 to:

Alex B. Kaufman
**CHALMERS, ADAMS & KAUFMAN, LLC.**
11770 Haynes Bridge Road, Suite 205
Alpaharetta, GA 30309-1968
(404) 964-5587
E-mail:  akaufman@ChalmersAdams.com

*Attorneys for DPG Investments, LLC and Golden Eagle, LLC*

/s/ Peggy Nieto